T.C. Memo. 2018-104

UNITED STATES TAX COURT

ESTATE OF TRAVIS L. SANDERS, DECEASED, THOMAS S. HOGAN, JR.,
PERSONAL REPRESENTATIVE, Petitioner, AND THE GOVERNMENT OF
THE UNITED STATES VIRGIN ISLANDS, Intervenor v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 4614-11.                           Filed July 5, 2018.

William M. Sharp, David S. Barnhill, and Vernon Jean Owens, for

petitioner.

Vincent F. Frazer, Peter N. Hiebert, and Geoffrey P. Eaton, for intervenor.

Christopher A. Pavilonis and Anne. M. Craig, for respondent.

---

[*]This opinion supplements Estate of Sanders v. Commissioner (Sanders I),
144 T.C. 63 (2015), vacated and remanded, Commissioner v. Estate of Sanders
(Sanders II), 834 F.3d 1269 (11th Cir. 2016).

**[*2]**          SUPPLEMENTAL MEMORANDUM FINDINGS OF
                          FACT AND OPINION

KERRIGAN, <u>Judge</u>:  This matter is before the Court on remand from the

Court of Appeals for the Eleventh Circuit for further consideration consistent with

its opinion in <u>Commissioner v. Estate of Sanders</u> (<u>Sanders II</u>), 834 F.3d 1269 (11th

Cir. 2016), <u>vacating and remanding</u> <u>Estate of Sanders v. Commissioner</u>

(<u>Sanders I</u>), 144 T.C. 63 (2015).

The Court of Appeals held that the period of limitations pursuant to section

6501(a) was triggered only if decedent, Travis L. Sanders, was a bona fide resident

of the United States Virgin Islands (USVI).  <u>Id.</u> at 1285.  The Court of Appeals'

remand instructed this Court to make factual findings regarding the amount of

time decedent spent in the USVI.[1]  <u>Id.</u>

Respondent determined the following deficiencies and additions to tax with

respect to tax years 2002, 2003, and 2004:

---

[1]The Court of Appeals for the Eleventh Circuit noted that decedent's case is
especially weak for 2002.  <u>Sanders II</u>, 834 F.3d at 1284.

[*3]

| | | Additions to tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 2002 | $485,805 | $98,821 | $109,801 | $1,667 |
| 2003 | 106,758 | 24,021 | 26,690 | 2,754 |
| 2004 | 54,648 | 12,296 | 13,662 | 1,566 |

The issue for consideration on remand is whether decedent was a bona fide resident of the USVI. Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

FINDINGS OF FACT

Facts with respect to this case were found in our original opinion, Sanders I, and are incorporated by this reference. We clarify and add to the facts to address the holding in Sanders II, 834 F.3d at 1284, that "facts relied upon by the Tax Court are insufficient to establish that Sanders ever became a bona fide resident of the USVI".

Decedent, a U.S. citizen, lived in Florida when he filed the petition. On November 13, 2012, decedent died.

**[*4]** Decedent's Companies

Decedent built his own companies to both manufacture and distribute surge suppression devices. Decedent owned three surge suppression companies, ITD of Destin, Inc., Surge Suppression, Inc., and Surge Technology, Inc. (collectively decedent's companies or his companies). Decedent owned 100% of the stock of all of his companies at all times during tax years 2002, 2003, and 2004. Surge Suppression, Inc., and Surge Technology, Inc., had management agreements with ITD of Destin, Inc. Under the terms of the management agreements, ITD of Destin, Inc., was to provide administrative and labor services to both Surge Suppression, Inc., and Surge Technology, Inc. Effective December 30, 2003, Surge Suppression, Inc., and Surge Technology, Inc., merged into ITD of Destin, Inc., which was renamed Surge Suppression, Inc. (SSI). Surge Suppression, Inc., Surge Technology, Inc., and ITD of Destin, Inc., filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for tax years 2002 and 2003. SSI filed Form 1120S for tax year 2004.

Before decedent started his companies, he was an independent distributor for Innovative Technology, where he met Thomas Hogan, a legal representative to Innovative Technology. In approximately 1995 decedent and Mr. Hogan traveled to St. Croix, USVI, to explore opportunities to work with another company. The

[*5] two became friends and built a business and social relationship. In 1997 Mr. Hogan began to represent decedent on legal matters and continued the representation until decedent's death.

Decedent considered selling his companies in 2002 but decided not to go through with the sale. The potential buyer expressed concern that the companies were too dependent on decedent's personal involvement and that they might fail to flourish in his absence. After the unsuccessful sale effort, decedent wanted to make changes to his companies' management and operations structure in order to exert less control. Decedent planned to operate his companies from the USVI and ultimately retire there.

Madison Associates, L.P.

In 2001 Mr. Hogan partnered with Rick Roberts, Victor Taglia, and Alan Teegardin to start Madison Associates, L.P. (Madison), a designated services business in the USVI. Madison provided scientific, electronic, investment, economic, and management consulting services to businesses in the United States. Mr. Teegardin was licensed to practice law in the USVI. Mr. Roberts was a certified public accountant in Florida. This group hired USVI attorney Vince Fuller to organize Madison and serve as the general partner. They were interested in benefiting from the USVI economic development program (EDP), which had

[*6] recently expanded to include consulting businesses. Madison established a USVI office at the American Yacht Harbor, in an area known as Red Hook.

Madison published a pamphlet about becoming a limited partner in Madison. Madison advertised that each of its limited partners received a 90% tax credit on distributions from Madison as a result of being a USVI resident. Each limited partner was entirely responsible for bringing in his or her own revenue to Madison. Limited partners did not share each other's revenue, and each partner had his or her own capital account. Each limited partner paid Madison up to a 5% fee of the revenue attributable to that limited partner. After overhead and general partner allocations were paid, the limited partner was entitled to a distribution of the remaining capital in his or her own account.

Mr. Hogan introduced decedent to Madison. On September 25, 2002, decedent signed a Supplemental Agreement to Agreement of Limited Partnership of Madison Associates, which made him a limited partner of Madison. Decedent also signed an employment agreement with Madison on that date. The contract stated that the "[e]mployee agrees to devote his full-time talent and abilities to Employer for so long as this Agreement is in effect." The contract required decedent to maintain records "including, but not limited to Affidavits of residency or other certification for filing with the Economic Development Commission."

**[\*7]**  Also on September 25, 2002, decedent executed an agreement on behalf of ITD of Destin, Inc., whereby ITD of Destin, Inc., would pay Madison fees for consulting.  Decedent was to provide the consulting services on behalf of Madison to ITD of Destin, Inc.  Decedent's two other companies, Surge Technology, Inc., and Surge Suppression, Inc., never entered into consulting agreements with Madison.

Tax Years 2002-04

At the beginning of 2002 decedent was divorced and the father of a minor son (minor son) and an adult daughter.  Decedent and Kathleen Hennessy, decedent's fiancee and future wife, lived in a home in Destin, Florida (Destin).  The home was approximately 2,500 to 3,000 square feet.  The value of the Destin home was approximately $275,000.  Decedent continued to own this home through 2004.

Decedent's daughter was a college student who resided in Maryland.  Minor son resided in Destin with his mother, who had sole custody.  Decedent shared parenting rights with minor son's mother.  When decedent was in Destin, minor son would often stay with him.

During 2002-04 decedent traveled frequently, and his travel during this period was greater than his travel throughout 1999-2001.  From September 2002

[*8] through December 2004 decedent traveled for work and visits to minor son. Decedent traveled extensively for his companies, whose headquarters and primary market were in the continental United States.

Decedent maintained contact with his family and business associates via a satellite phone, which he carried with him. Decedent also had a phone which was linked to his computer. Various employees of decedent's companies also visited him in the USVI, including Richard Lindsay, Paul Whittlesey, Timothy Keys, Michael Barton, Richard Stevens, and Tom Butcher.

The presence of decedent's companies in the USVI was limited. However, the electrical structure in the USVI was fragile, and there were often power surges. Since decedent's companies' products could help address some of these issues, the USVI was a potential market. Decedent's companies sold directly to the USVI and not through its international distributor, as they did not have a distribution center in the USVI during 2002-04. Anthony Merrill, a USVI resident, began working with decedent to learn about the surge suppression devices and to establish potential USVI clients. Mr. Merrill also attended sales calls and meetings with decedent for potential clients.

The potential clients of decedent's companies in the USVI included the American Yacht Harbor, the Ritz-Carlton, the Island Beachcomber Hotel, the

[*9] West Indian Dock Co., the Department of Education, RRT Produce LLC, and the University of the Virgin Islands. Mr. Merrill conducted site surveys for these potential clients throughout 2003 and 2004, and these surveys would then be used to create price quotations and contracts. Of the potential clients, SSI successfully contracted and oversaw the installation of surge suppression devices at the West Indian Company Dock in 2004.

Throughout 2002-04 decedent began restructuring the organization of his companies. Decedent intended to run his business from the USVI and promote individuals from within the business or hire others to perform more of the day-to-day management. For example, Mr. Stevens, a salesman, gained an increased role. He was hired by decedent in 1994 and worked for decedent's other businesses before becoming a salesman for the companies. Following decedent's move to the USVI, he began to rely more heavily on Mr. Stevens to review and address the effectiveness of daily operations at his companies and to provide feedback regarding these issues. As a result of this restructuring, during 2002-04 decedent had limited involvement in the operational aspects of his companies.

During 2003-04 decedent involved himself in the USVI community, predominantly in the Red Hook area. Decedent's boat and home, the Nazdar, was moored in this area. See infra p. 13. The Red Hook area is home to many food

[*10] and beverage establishments in the USVI, which decedent visited. Decedent showed his daughter around the USVI community during her visits, introducing her to his local friends and work colleagues at Red Hook.

Decedent also attended meetings or events of local organizations in the USVI such as the Humane Society, the Rotary Club, the Chamber of Commerce, and the Virgin Islands National Park. Decedent and minor son had individual memberships with the USVI Humane Society from 2002-04 and from 2003-04, respectively, and decedent made a donation to the Humane Society in July 2003.

Decedent suffered from serious heart conditions and underwent triple bypass surgery in 1999. During 2002-04 decedent traveled at least once a year to receive specialized medical treatment from his longtime physician, who was based in Florida. Decedent also maintained a membership with Medical Air Services Association International, which provided air transportation from the USVI to the United States in the event of an emergency medical situation.

Tax Year 2002

Decedent began making visits to the USVI in the fall and winter of 2002. Decedent was present in the USVI in September, November, and December for a total of eight days. Decedent's credit card and bank transaction history place him in the USVI on the following days: September 22-25, November 16-18, and

[*11] December 13. His credit card and bank records show that he spent 64 days in the Destin area from September to December. He was in the Destin area for 18 days in December.

Following decedent's decision to move to the USVI, decedent informed his daughter and minor son's mother of his intentions. Both decedent's daughter and minor son's mother expressed concerns over the move as decedent had a close relationship with his children. Decedent assured minor son's mother that he would continue to see minor son regularly. Decedent also assured both minor son's mother and his daughter that he would maintain his home in Destin so minor son could grow up with an established home. Ms. Hennessy also resided at this home.

Minor son did not travel to the USVI in 2002. In 2002 decedent spent Thanksgiving in Destin with minor son and Christmas in Ohio with Ms. Hennessy's family. During the Thanksgiving holiday decedent showed his daughter his USVI driver's license.

In the fall of 2002 decedent hired a real estate broker and began to pursue both rental and purchase property in the USVI. When decedent traveled to the USVI during 2002, he stayed at the Ritz-Carlton. He was able to store his personal items in a storage container at the Ritz-Carlton. Decedent was also able

**[*12]** to work remotely for his companies while traveling, and thus could work from the USVI.

During 2002 decedent maintained a checking account at Banco Popular de Puerto Rico in St. Thomas, USVI. The address provided for the checking account was Madison's office address. As it was routine for mail to be stolen from mailboxes in the USVI, most individuals in the USVI rented post office boxes. In the early 2000s scarcity made obtaining a post office box difficult. Consequently, many individuals in the USVI, including decedent, used their employer's post office box.

Tax Year 2003

Decedent was present in the USVI in April, May, June, July, September, October, and December. Decedent's credit card and bank transaction history place him in the USVI for 50 days in 2003. His credit cards and bank records place him in the Destin area for 149 days in 2003.

Decedent wrote checks out to cash and to himself, and the bank, credit card, and airline transaction history do not account for every day of 2003. He had several credit cards, including credit cards on behalf of his businesses. Some of the records for these cards identify expenses as decedent's expenses. Other cards include expenses, such as hotel rooms and meals, without identifying the user.

[*13] Decedent's employees' airline and travel expenses were charged on decedent's business credit cards. Decedent's business schedule and the manner in which he kept his records often made it difficult to tell his exact location. The record, however, demonstrates decedent was in the USVI on the following days in 2003: April 21-26, May 20-25, June 16-23, July 17-25, September 18-21, October 16-21, and December 17-22 and 27-31.[2] In December 2003 decedent was in the USVI for 11 days and in Destin for 7 days.

In 2003 decedent purchased a vessel called the Nazdar. Many people in the USVI lived on boats. Decedent was an active fisherman fond of boats and had owned multiple boats in the 1990s. He purchased the Nazdar through STT Equipment, LLC (STT), a USVI limited liability company during 2003 and 2004. The Travis L. Sanders Revocable Inter Vivos Trust and the Hogan Family, LLC, were equal owners of STT, making decedent and Mr. Hogan equal owners of the Nazdar. The Nazdar's insurance policy stated its value at $300,000. Decedent extensively renovated the vessel in Florida before moving it to the USVI.

---

[2]For most of these days there were credit card receipts placing decedent in the USVI. For May 22 and December 20, 2003, there are no records, but the records that do exist place decedent in the USVI on the day before and the day after each of these days.

**[\*14]** Decedent also placed personal effects from his Destin home on the <u>Nazdar</u> before the move.

On February 11, 2003, decedent signed a document titled "Lease Agreement" among STT and himself, ITD of Destin, Inc., and the Hogan Law Firm, LLC. The terms of the lease were from February 11, 2003, through December 31, 2015. The agreement was a landlord-tenant agreement and outlined the terms of use for the <u>Nazdar</u>. Beginning in the spring of 2003 the <u>Nazdar</u> was moored in the American Yacht Harbor in St. Thomas, USVI. The <u>Nazdar</u> remained moored at the American Yacht Harbor through 2004, though decedent would occasionally travel to other local islands, such as Antigua, Guadalupe, and Mebus.

Decedent entered into lease agreements with the American Yacht Harbor which pertained to the dockage of the <u>Nazdar</u> for the period between April 1, 2003 and 2004, and the period between April 1 and December 31, 2004. The cost to dock the <u>Nazdar</u> at the American Yacht Harbor was 74 cents per foot per day. As the yacht was approximately 65 feet long, this fee totaled $1,443 per month.

Decedent resided on the <u>Nazdar</u> during 2003. The <u>Nazdar</u> was approximately 65 feet long and 20 feet wide. The <u>Nazdar</u> was two stories and had a full kitchen, a second, smaller kitchen on the second floor, an elevator, five

[*15] bedrooms including a master suite, and hardwood floors. The <u>Nazdar</u> also had a landline phone and was connected to utilities, including cable television. Decedent moved his personal effects from the Ritz-Carlton to the <u>Nazdar</u>.

Decedent ensured that the <u>Nazdar</u> was fully equipped so that he could perform obligations to his companies while there. Mr. Hogan, decedent's roommate and coowner of the <u>Nazdar</u>, referred to the <u>Nazdar</u> as "home." Decedent updated his USVI driver's license to reflect his address at the American Yacht Harbor. When in the USVI, decedent worked from the <u>Nazdar</u> and from Madison's office.

Beginning in 2003 decedent's daughter spent her available vacation time visiting her father in the USVI. Decedent's daughter would stay on the <u>Nazdar</u> during her visits. Before docking the <u>Nazdar</u> at the American Yacht Harbor, decedent continued to have a condominium available to him at the Ritz-Carlton. Decedent's daughter and her boyfriend visited and stayed at the condominium during this period.

Decedent often invited friends and business associates aboard the <u>Nazdar</u>. Employees from the Madison office at the American Yacht Harbor would often visit the <u>Nazdar</u> because it was docked only steps away from the office. Decedent also often threw parties aboard the <u>Nazdar</u>, including a New Year's Eve party in

[*16] 2003. Decedent's daughter and Ms. Hennessy, along with others, attended that party.

During spring 2003 Mr. Whittlesey, chief financial officer (CFO) of decedent's companies, traveled to the USVI to set up decedent's computers on the Nazdar. Mr. Whittlesey accompanied decedent to a local business in Red Hook at which the individuals knew decedent by name. Mr. Barton and Mr. Keys, marketing directors of decedent's companies, also visited decedent in the USVI in spring 2003. Mr. Keys had previously traveled to the USVI in October and did so again in December 2003. Mr. Keys was there on business, which included training Mr. Merrill to sell surge suppression products to potential clients in the USVI. They stayed on the Nazdar during their visit. Mr. Lindsey, a company salesman, visited decedent in the USVI at least four times at the beginning of 2003.

Decedent was a member of the St. Thomas Yacht Club and the Virgin Islands Game Fishing Club during 2003. On decedent's application to the Virgin Islands Game Fishing Club, he gave the USVI as his address and provided a USVI phone number.

On June 18, 2003, decedent married Ms. Hennessy in the USVI. Decedent's marriage license and certificate reported the USVI as his residence. Decedent's

[*17] daughter and minor son both attended the wedding. Half of the wedding guests were USVI residents. Following the marriage decedent's wife remained a resident of Destin to pursue her career at a veterinary clinic; however, she traveled to the USVI in June, July, October, and December of 2003.

Tax Year 2004

Decedent was present in the USVI in January, February, March, April, May, June, July, September, October, and December. Decedent's credit card and bank transaction history place him in the USVI for 77 days and the Destin area for 99 days in 2004. Decedent wrote checks out to cash and to himself, and the bank, credit card, and airline transaction history do not account for every day of 2004.

Decedent was in the USVI on the following days in 2004: January 1-3 and 17-24, February 14-20, March 14-18, April 11-17 and 29-30, May 1-6, June 17-2, July 24-25, 31, September 4-9 and 23-26, October 13-20, and December 26-31.[3] Decedent also traveled to the British Virgin Islands on December 31, 2004.

Decedent's daughter spent a February vacation, Thanksgiving, and New Year's Eve with him in the USVI in 2004. Decedent's wife traveled to the USVI

---

[3]For most of these days there were credit card transactions placing decedent in the USVI. For January 21, April 16, October 15 and 17, and December 29, 2004, there were no records, but decedent was in the USVI on the day before and the day after each of these days. The record shows that decedent rented a car in the USVI from January 17-24, 2004.

[*18] at least seven times in 2004. She was in the USVI in January, March, April, May, June, October, and December. Decedent also met with SSI employees in the USVI during 2004, including Mr. Keys during the spring and Mr. Barton and Spencer Dickey in June.

In 2004 decedent copurchased a 2000 Chevy Suburban for his use on the island. Decedent also had bank accounts with UBS Financial Services, Inc., and First Bank Puerto Rico (First Bank) in the USVI during 2004. Checks for his First Bank account listed Madison's address as his address. In July 2004 decedent made a $1,000 charitable donation to One Swim, Inc., a St. Thomas corporation. He continued to be a member of the St. Thomas Yacht Club, where he would often attend Friday night dinners.

Later Years

Decedent maintained a home on the Nazdar in the USVI for many years, and his daughter continued to visit him through 2010 for summer and Christmas holidays. Continuing after 2004 and until approximately a year before decedent's death, he employed Joseph Herbert to maintain and operate the Nazdar in the USVI.

[*19] <u>Tax Returns</u>

The Virgin Islands Bureau of Internal Revenue (VIBIR) directs individual and entity taxpayers to file their income tax returns using the same forms that the Internal Revenue Service (IRS) uses in administering the Code. Decedent filed Forms 1040, U.S. Individual Income Tax Return, with the VIBIR for tax years 2002-04. Decedent filed Form 1040 with the IRS for tax year 2001. The amount of income tax reported on the return for tax year 2001 was $83,513.

Decedent filed his 2002, 2003, and 2004 tax returns on October 15, 2003 and 2004, and December 15, 2005, respectively. On each Form 1040 decedent reported a home address in the USVI, which was Madison's office address.

Decedent's 2002-04 Forms 1040 were prepared by certified public accountants in the USVI. Decedent also consulted with a USVI-based attorney, Marjorie Rawls Roberts. Ms. Roberts' practice focuses on tax and corporate law, and she also worked with Madison regarding residency and EDP requirements. Decedent first met with Ms. Roberts in the fall of 2002 so that she could advise him regarding USVI residency, which was required in order for him to be a limited partner of Madison. Ms. Roberts prepared a detailed, 119-item questionnaire to evaluate whether a taxpayer is a bona fide resident of the USVI. She gave decedent the questionnaire to fill out, and they reviewed it during their next

[*20] meeting on September 19, 2003. During this meeting Ms. Roberts advised decedent in regard to his residency status for the filing of his 2002 tax return. She informed him that he could file as a resident of the USVI for tax year 2002. She did not inform decedent that he needed to file a tax return with the IRS for tax year 2002.

Ms. Roberts prepared a draft residency opinion for decedent based on the September 19, 2003, meeting and followup documents he provided. However, the draft opinion was written on the assumption that decedent would provide certain additional information and documents, such as updated estate documents and a voter's registration card to reflect his change of residency to the USVI. Ms. Roberts met with decedent on January 5, 2004, to discuss the draft residency opinion and certain open items in the draft opinion. Ms. Roberts' January 5, 2004, draft residency opinion was never finalized.

The VIBIR provided the IRS with a partial copy of decedent's 2002 tax return consisting of the first two pages of his Form 1040 for tax year 2002. This partial Form 1040 was marked as received by the IRS in Philadelphia, Pennsylvania, on December 29, 2003.

Decedent did not file Forms 1040 with the IRS for tax years 2002-04. On April 7, 2009, the IRS prepared substitutes for returns for decedent for tax years

[*21] 2002-04.  Decedent made estimated tax payments of $20,000 and $25,000 on June 15 and September 15, 2002, respectively, to the U.S. Treasury for tax year 2002.  Decedent did not make any estimated tax payments to the U.S. Treasury for tax years 2003 and 2004.

Decedent made estimated tax payments of $74,250 to the VIBIR for tax year 2003.  For tax year 2004 decedent made an estimated tax payment of $53,363 to the VIBIR.

Claimed Deductions for 2002-04

ITD of Destin, Inc., claimed a deduction of $375,000, allegedly for payments for consulting services provided by Madison for 2002.  Surge Suppression, Inc., claimed a deduction of $658,000, allegedly for payments for consulting services provided by Madison for 2002.  Surge Technology, Inc., claimed a deduction of $167,000, allegedly for payments for consulting services provided by Madison for 2002.  Decedent's companies claimed total deductions for alleged payments for consulting services provided by Madison of $1,200,000 for 2002.  Madison then issued decedent a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., which reflected that decedent received USVI-source ordinary income of $1,054,081 in 2002.

[*22] In 2003 ITD of Destin, Inc., claimed a deduction of $75,000, allegedly for payments for consulting services provided by Madison. Surge Suppression, Inc., claimed a deduction of $150,000, allegedly for payments for consulting services provided by Madison for 2003. Surge Technology, Inc., claimed a deduction of $75,000, allegedly for payments for consulting services provided by Madison for 2003. Decedent's companies claimed total deductions for alleged payments for consulting services provided by Madison of $300,000 for 2003. Madison then issued decedent a Schedule K-1 which reflected that decedent received $114,660 of USVI-source ordinary income in 2003.

SSI claimed a deduction for alleged payments for consulting services provided by Madison for $5,000 in 2004. Madison then issued decedent a Schedule K-1, which reflected a USVI-source ordinary loss of $41,754 in 2004.

Notice of Deficiency

On November 30, 2010, respondent issued decedent a notice of deficiency with respect to tax years 2002-04. In the notice of deficiency respondent determined that: (1) decedent was not a bona fide resident of the USVI for tax years 2002-04; (2) all transactions among decedent, his companies, and Madison lacked economic purpose and substance; (3) decedent was not entitled to the gross income exclusion under section 932(c)(4) for any of tax years 2002-04;

[*23] (4) decedent was required to file a Form 1040 for each of tax years 2002-04 with the IRS; and (5) decedent was liable for additions to tax under sections 6651(a)(1) and (2) and 6654. The estate concedes all of the adjustments to income in the notice of deficiency except respondent's disallowance of the consulting service fee deductions claimed by decedent's companies relating to the consulting fees ostensibly paid to Madison.

Attached to the notice of deficiency was a Form 886-A, Explanation of Items, which states the following:

> It is determined that you were not a bona fide resident of the United States Virgin Islands ("USVI") for the taxable years 2002, 2003, and 2004. During each of those taxable years, you participated in a tax avoidance arrangement similar to that described in IRS Notice 2004-45, Meritless Filing Position Based on Sections 932(c)(4) and 934(b), which involved improperly claiming to be a bona fide resident of the USVI and, through use of sham arrangements, superficially recasting income from sources within the United States as income from sources within in the USVI in order to inappropriately and invalidly claim a 90% territorial income tax credit under the USVI Economic Development Program.[4]

---

[4]Notice 2004-45, 2004-2 C.B. 33, states that the "highly questionable" positions described in this notice may be promoted to taxpayers in a variety of forms. However, they have frequently been promoted in the following manner:

> Promoters typically approach a taxpayer (Taxpayer) living and working in the United States and advise Taxpayer to (i) purport to become a USVI resident by establishing certain contacts with the USVI, (ii) purport to terminate his or her existing employment

(continued...)

**[*24]** Decedent filed timely his petition with this Court. The estate contends that the period of limitations under section 6501(a) applies to bar respondent from assessing the deficiencies and additions to tax determined in the notice of deficiency.

OPINION

I.     The USVI

Our Opinion in Sanders I provides background with respect to the USVI and its tax system. We summarize for convenience the pertinent law.

The USVI is an unincorporated territory of the United States acquired in 1916. 48 U.S.C. sec. 1541(a) (2006). The USVI is not part of one of the 50 States or the District of Columbia, and it is generally not part of the United States for tax purposes. See sec. 7701(a)(9).

In the Naval Service Appropriations Act of 1922, ch. 44, sec. 1, 42 Stat. at 123 (1921) (codified as amended at 48 U.S.C. sec. 1397 (2006)), Congress created a tax system for the USVI. This tax system, usually referred to as the mirror code,

---

[4](...continued)
relationship with his or her employer (Employer) and (iii) purport to become a partner of a Virgin Islands limited liability partnership ("V.I.LLP") that is treated as a partnership for U.S. tax purposes. V.I.LLP then purports to enter into a contract with Employer to provide Employer with substantially the same services that were provided by Taxpayer prior to the creation of this arrangement. * * *

**[*25]** mirrors the provisions of the Code except that "Virgin Islands" is substituted for "United States" throughout. Id. Originally, corporations and U.S. citizens residing in the USVI who received both U.S.- and USVI-source income were required to file returns with, and pay taxes to, both jurisdictions. Appleton v. Commissioner, 140 T.C. 273, 278 (2013).

In 1954 Congress modified the administration of the mirror code and established the "inhabitant rule" by enacting the Revised Organic Act of the Virgin Islands (ROA), ch. 558, sec. 28, 68 Stat. at 508 (1954). ROA sec. 28(a) provided that corporations and individuals whose permanent residence was in the USVI satisfied their U.S. income tax obligations by "paying their tax on income derived from all sources both within and outside the Virgin Islands in the treasury of the Virgin Islands". Pursuant to the ROA any taxes levied by Congress on the inhabitants of the USVI would be covered into (i.e., paid to) the USVI Treasury. Id.

In 1986 Congress repealed the inhabitant rule as part of the Tax Reform Act of 1986 (TRA), Pub. L. No. 99-514, sec. 1274(a), 100 Stat. at 2596. As part of the TRA Congress enacted a new section, section 932, which coordinates U.S. and USVI income taxes for individuals who are bona fide residents of the USVI. Appleton v. Commissioner, 140 T.C. at 279.

**[*26]** A.     <u>Section 932</u>

Section 932 provides rules that govern the coordination of the U.S. income tax system and the USVI income tax system.  Specifically, section 932 provides the filing and payment requirements for "United States residents" (U.S. residents) and "Virgin Islands residents" (USVI residents).  With respect to U.S. residents section 932(a) provides as follows:

> SEC. 932(a).  Treatment of United States Residents.--
>
> > (1) Application of subsection.--This subsection shall apply to an individual for the taxable year if--
> >
> > > (A) such individual-
> > >
> > > > (i) is a citizen or resident of the United States (other than a bona fide resident of the Virgin Islands at the close of the taxable year),[5] and
> > > >
> > > > (ii) has income derived from sources within the Virgin Islands, or effectively connected with the conduct of a trade or business within such possession, for the taxable year, or

---

[5]Sec. 932 was amended, effective for tax years ending after October 22, 2004, to replace the phrase "at the close of the taxable year" with the phrase "during the entire taxable year".  American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, sec. 908(c)(2), 118 Stat. at 1656.  Thus, the amendment applies for decedent's tax year 2004.  <u>Id.</u> sec. 908(d)(1), 118 Stat. at 1657.

**[*27]**                           (B) such individual files a joint return for the taxable year with an individual described in subparagraph (A).

(2) Filing requirement.--Each individual to whom this subsection applies for the taxable year shall file his income tax return for the taxable year with both the United States and the Virgin Islands.

(3) Extent of income tax liability.--In the case of an individual to whom this subsection applies in a taxable year for purposes of so much of this title (other than this section and section 7654) as relates to the taxes imposed by this chapter, the United States shall be treated as including the Virgin Islands.

Section 932(b)(1) provides the payment requirements for U.S. residents. U.S. residents "shall pay the applicable percentage" of the income tax shown due on their tax returns to the USVI. The applicable percentage is the percentage which the amount of a U.S. resident's USVI adjusted gross income bears to his or her total adjusted gross income. Sec. 932(b)(2). U.S. residents may claim credits on their U.S. tax returns equal to the amounts of the tax paid to the USVI. Sec. 932(b)(3).

With respect to USVI residents section 932(c) provides:

SEC. 932(c). Treatment of Virgin Islands Residents.--

(1) Application of subsection.--This subsection shall apply to an individual for the taxable year if–

**[*28]**         (A) such individual is a bona fide resident of the Virgin Islands at the close of the taxable year,[6] or

(B) such individual files a joint return for the taxable year with an individual described in subparagraph (A).

(2) Filing requirement.--Each individual to whom this subsection applies for the taxable year shall file an income tax return for the taxable year with the Virgin Islands.

(3) Extent of income tax liability.--In the case of an individual to whom this subsection applies in a taxable year for purposes of so much of this title (other than this section and section 7654) as relates to the taxes imposed by this chapter, the Virgin Islands shall be treated as including the United States.

(4) Residents of the Virgin Islands.--In the case of an individual--

(A) who is a bona fide resident of the Virgin Islands at the close of the taxable year,[7]

(B) who, on his return of income tax to the Virgin Islands, reports income from all sources and identifies the source of each item shown on such return, and

(C) who fully pays his tax liability referred to in section 934(a) to the Virgin Islands with respect to such income,

---

[6]See supra note 5.

[7]See supra note 5.  This change does not affect the outcome of this case.

[*29]  for purposes of calculating income tax liability to the United States, gross income shall not include any amount included in gross income on such return, and allocable deductions and credits shall not be taken into account.[8]

Section 932 established two distinct filing regimes: one for bona fide residents of the USVI and one for those who are not bona fide residents. Bona fide residents file their tax returns with the VIBIR. Those who are not bona fide residents must each file two income tax returns: one with the IRS, and one with the VIBIR. The bona fide resident's single tax return filed with the VIBIR pursuant to section 932(c) satisfies both the taxpayer's territorial and Federal tax filing obligations. Sec. 932(c)(4); see Huff v. Commissioner, 743 F.3d 790 (11th Cir. 2014) (allowing intervention by the USVI), rev'g and remanding 138 T.C. 258, 262 (2012).

B. The Tax Implementation Agreement

In order to ensure the "fair implementation" of section 932, the United States and the USVI entered into an agreement "for the exchange of information and mutual assistance with respect to taxes in order to prevent the evasion or avoidance of United States or Virgin Islands taxes". Tax Implementation

---

[8]Sec. 932(c) is not included in the mirror code and is not an element of the USVI territorial tax system. See S. Rept. No. 100-445, at 324 (1988), 1988 U.S.C.C.A.N. 4515, 4825-4826.

[*30] Agreement Between the United States of America and the Virgin Islands (TIA), Feb. 24, 1987, 1989-1 C.B. 347, 347-348.  The TIA applies to (1) all taxes imposed by the Code, (2) all taxes imposed by the mirror code, and (3) all local income taxes imposed by the USVI as authorized by the TRA.  See id. art. 2, 1989-1 C.B. at 348.  TIA article 4 governs the exchange of information between the two Governments.  Clause 1 provides that the competent authorities of the United States and the USVI shall exchange information to administer and enforce their respective tax laws.  See id. art. 4(1), 1989-1 C.B. at 348.

TIA article 4(2)(b) provides that the USVI shall routinely supply to the United States information with respect to audit changes that disclose information of interest to the U.S. Government, including, among other matters, (1) information about the ownership interests of all corporations subject to USVI tax having non-USVI-source income and which receive a rebate, subsidy, or deduction of USVI taxes and (2) information about any individual subject to USVI tax who has non-USVI-source income and who claims for the first time to be a USVI resident.  In addition, TIA article 4(2)(b) provides that the USVI shall supply to the United States "copies of reports of individual, partnership, corporate, and employment audit changes that disclose information relevant to the United States".  Id. art. 4(2)(b)(i), 1989-1 C.B. at 348-349.  The TIA provides that the

**[\*31]** VIBIR will permit the IRS to examine USVI tax returns. <u>Id.</u> app. A, sec. 3.1, 1989-1 C.B. at 352.

II.    <u>Federal Tax Filing Requirements</u>

U.S. citizens are subject to Federal reporting requirements and taxation on their worldwide income as set forth in the Code. <u>See, e.g.</u>, <u>Cook v. Tait</u>, 265 U.S. 47, 56 (1924); <u>Huff v. Commissioner</u>, 138 T.C. at 262 n.5. Several sections of the Code govern an individual's filing requirements. Section 6012(a)(1)(A) provides that every individual with gross income for the taxable year which equals or exceeds the exemption amount, with certain exceptions not relevant here, is required to file a U.S. income tax return. Thus, a choreographed interplay between sections 6012(a) and 932(c), together with mirror code section 6012(a), governs the tax filing responsibilities of individuals having income equal to or in excess of the exemption amount. <u>See</u> <u>Appleton v. Commissioner</u>, 140 T.C. at 281.

Although an individual having gross income for the taxable year which equals or exceeds the exemption amount must file a Federal tax return, section 932(c)(2) directs bona fide residents of the USVI to file income tax returns with the USVI (through the VIBIR), and section 932(c)(4) (flush language) exempts both U.S.-source income and USVI-source income from U.S. taxation if all of the requirements of section 932(c)(4) are met. <u>Appleton v. Commissioner</u>, 140 T.C. at

**[\*32]** 281. But if any requirement of section 932(c)(4) is not satisfied, then the individual falls back into the Federal tax reporting and payment system, because his or her income would no longer be excluded for purposes of calculating his or her U.S. tax liability. Appleton v. Commissioner, 140 T.C. at 281.

Section 7654(e) provides that the Secretary shall prescribe such regulations as may be necessary to carry out the provisions of section 932, including prescribing the information which individuals to whom section 932 applies must furnish to the Secretary. The Secretary did not, however, promulgate regulations for the years in issue. We turn to other sections of the Code, as well as regulations and IRS instructions, for guidance as to the place where decedent was required to file his tax returns for the years in issue. See Appleton v. Commissioner, 140 T.C. at 282.

Section 6091 generally governs the place where a U.S. taxpayer is required to file a tax return. Section 6091(b)(1)(B)(ii) (flush language) provides that "citizens of the United States whose principal place of abode * * * is outside the United States" shall file their tax returns "at such place as the Secretary may by regulations designate." Pursuant to the authority granted by the statute, the Secretary promulgated section 1.6091-1(a), Income Tax Regs., which provides that, in general, whenever an income tax return is required to be filed and the place

**[*33]** for filing the return is not provided by the Code, the tax return shall be filed at the place prescribed by the regulations.

Section 1.6091-3, Income Tax Regs., requires that certain tax returns be filed with (1) the Director of Internal Operations, Internal Revenue Service, Washington, D.C. 20225, or (2) the District Director, or (3) the director of the service center, depending on the appropriate officer designated on the return form or in the instructions issued with respect to the form.[9] These tax returns include the income tax return of (1) an individual citizen of the United States whose principal place of abode for the period with respect to which the return is filed is outside the United States and (2) an individual citizen of a possession of the United States (whether or not a citizen of the United States) who has no legal residence or principal place of business in any internal revenue district of the United States. Sec. 1.6091-3(b) and (c), Income Tax Regs. A taxpayer's principal place of abode will be considered to be outside the United States if his or her legal residence is outside the United States or if his or her tax return bears a foreign address. Id. para. (b).

---

[9]This regulation was revised in 2004, and the revisions were effective September 16, 2004. The position of the District Director no longer existed after 1998. This change and these revisions do not affect this case.

[*34] The VIBIR directs individual and entity taxpayers to file their income tax returns using the same forms that the IRS uses in administering the Code. The instructions to Form 1040 for 2002, 2003, and 2004 provide specific filing instructions. Under the heading "Where do you file", for each year the instructions state that "All APO, FPO addresses, American Samoa, nonpermanent residents of Guam or the Virgin Islands, Puerto Rico (or if excluding income under Internal Revenue Code section 933), dual-status aliens, a foreign country: U.S. citizens and those filing Form 2555, 2555-EZ or 4563" shall use the address of "Internal Revenue Service Center Philadelphia, PA 19255-0215 USA".

In a footnote the instructions state that "permanent residents of the Virgin Islands should use: V.I. Bureau of Internal Revenue, 9601 Estate Thomas, Charlotte Amalie, St. Thomas, VI 00802" when filing their Form 1040 individual income tax returns.[10]

During the years in issue the IRS issued Publication 570, Tax Guide for Individuals With Income From U.S. Possessions (rev. February 2003), which states that "[i]f you are a bona fide resident of the * * * [USVI] you must file your

---

[10]It appears that when the inhabitant rule was replaced by sec. 932, the IRS failed to update the instructions to Form 1040 and continued to use the terms "permanent resident of the Virgin Islands" and "nonpermanent resident of the Virgin Islands" despite their obsolescence. Appleton v. Commissioner, 140 T.C. 273, 284 n.17 (2013).

[*35] tax return on Form 1040 with the Government of the Virgin Islands and pay

the entire tax due to the Virgin Islands.  You do not have to file with the IRS for

any tax year in which you are a bona fide resident of the Virgin Islands".[11]  This

publication provides specific filing instructions for the different U.S. possessions.

The instructions for the USVI do not include qualifications for a bona fide

residency whereas the instructions for American Samoa provide specific factors

for determining bona fide residency.  These qualifications are included on Form

4563, Exclusion of Income for Bona Fide Residents of American Samoa.  For

2002 Publication 570 did provide the following example regarding bona fide

USVI residents:

> Mr. and Mrs. Maple left the United States on June 15, 2002, and
> arrived in the Virgin Islands on the same day.  They qualified as bona
> fide residents of the Virgin Islands on the last day of their tax year,
> December 31, 2002.
>
> Mr. and Mrs. Maple file Form 1040 with the Government of
> the Virgin Islands and attach a Form 1040 INFO.  The Maples report
> their worldwide income and pay the entire tax for the year to the
> Virgin Islands.  Even though they lived in the United States part of

---

[11]Publication 570 for tax year 2004 states that "[i]f you are a bona fide resident of the Virgin Islands during the entire tax year, you must file your tax return on Form 1040 with the Government of the Virgin Islands and pay the entire tax due to the Virgin Islands".  It further states that "you do not have to file with the IRS for any tax year in which you are a bona fide resident of the Virgin Islands".  Publication 570 was revised for tax year 2004 to reflect the changes of the AJCA.

**[*36]** the year, their income tax obligations for that year are completely satisfied by filing their return with, and paying their tax to, the Virgin Islands Bureau of Internal Revenue.

The same example appeared in Publication 570 for 2003.

The Senate Finance Committee report published with the TRA states that "[a]n individual qualifying as a bona fide Virgin Islands resident as of the last day of the taxable year will pay tax to the Virgin Islands under the mirror system on his or her worldwide income.  He or she will have no final tax liability for such year to the United States, as long as he or she reports all income from all sources and identifies the source of each item of income on the return filed with the Virgin Islands."  S. Rept. No. 99-313, at 482 (1986), 1986-3 C.B. (Vol. 3) 1, 482.

Notice 2004-45, 2004-2 C.B. 33, 34, states that "[t]he determination of whether an individual is a <u>bona</u> <u>fide</u> resident of the USVI turns on the facts and circumstances and, specifically, on an individual's intentions with respect to the length and nature of his or her stay in the USVI."

A.    <u>Bona Fide Residency</u>

The single filing requirement of section 932(c)(2) applies only if a taxpayer "is a bona fide resident of the Virgin Islands".  Sec. 932(c)(1)(A).  The term "bona

[*37] fide resident of the Virgin Islands" was not defined by the Code until 2004.[12]

The Secretary did not promulgate final regulations for determining whether a

taxpayer is a bona fide resident of the USVI until 2006.[13] As a result, a taxpayer

attempting to determine whether he or she was a bona fide resident of the USVI

for tax years 2002-03 would not find the answer in either the Code or the

regulations.

B.    Factors To Determine Bona Fide Residency

The meaning of residency varies according to context. Martinez v. Bynum,

461 U.S. 321, 330 (1983). For tax purposes residency has requirements different

---

[12]Sec. 937(a) does provide a test for determining whether a taxpayer is a "bona fide resident" of the Virgin Islands by creating a two-part residency test. The first part of the test requires an individual to be in the possession for at least 183 days during the tax year, and this requirement is effective for tax years beginning after October 22, 2004, and does not affect this case. AJCA sec. 908(d). The second part of the test requires that the taxpayer not have a closer connection to the United States or a foreign country during the year, and the effective date is for taxable years ending after the date of enactment, October 22, 2004. The second part of the test applies for decedent's 2004 tax year. However, the final regulations for sec. 937(a) allow taxpayers to apply the prior-law test for determining residency for 2004. See T.D. 9248, 2006-1 C.B. 524. The estate addresses only the prior law test in its arguments.

[13]On April 11, 2005, the Secretary published sec. 1.937-1T, Temporary Income Tax Regs., 70 Fed. Reg. 18940 (Apr. 11, 2005), which provided rules to implement sec. 937(a) concerning bona fide residents in U.S. possessions, including the USVI. On January 31, 2006, the Secretary published final regulations under sec. 937(a). Sec. 1.937-1, Income Tax Regs.

[*38] from those for domicile.  Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), rev'g and remanding 36 T.C. 131 (1961).  Unlike domicile, residency does not require "an intent to make a fixed and permanent home."  Vento v. Dir. of V.I. BIR, 715 F.3d 455, 467 (3d Cir. 2013) (quoting Sochurek v. Commissioner, 300 F.2d at 38).

In Sochurek v. Commissioner, 300 F.2d at 38, the Court of Appeals for the Seventh Circuit looked at 11 factors to determine whether a taxpayer's residency claim was bona fide:  (1) intention of the taxpayer; (2) establishment of a home in the foreign country for an indefinite period; (3) participation in activities; (4) physical presence in the foreign country; (5) nature, extent, and reasons for absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of employment; and (11) good faith in making the trip abroad.  The 11 factors can be grouped into four broad categories:  (1) intent; (2) physical presence; (3) social, family, and professional relationships; and (4) the taxpayer's own representations. Vento, 715 F.3d at 467 (considering the Sochurek factors as grouped into four categories for purposes of determining bona fide residency under section 932).

[*39] As we noted in Bergersen v. Commissioner, T.C. Memo. 1995-424 (applying the Sochurek factors to determine bona fide Puerto Rican residency under section 933), aff'd, 109 F.3d 56 (1st Cir. 1997), we have accepted and applied these factors in determining bona fide residency under other sections of the Code involving exclusions from gross income. See, e.g., Schoneberger v. Commissioner, 74 T.C. 1016, 1023 (1980); Dawson v. Commissioner, 59 T.C. 264, 268 (1972) (determining residency of U.S. citizen in Australia under section 911(a)(1)); Vazquez v. Commissioner, T.C. Memo. 1993-368 (determining whether a taxpayer was a bona fide resident of Puerto Rico). And because the same phrase is used for the same purpose in section 932, we see no reason to deviate from using the Sochurek factors as grouped in Vento in this case as well.

Even though factors were identified in Sochurek and grouped in Vento, "bona fide resident" is, at best, an elusive expression and one so peculiarly related to the facts in any given case that it must be decided on its own circumstances. Sochurek v. Commissioner, 300 F.2d at 38. The Court of Appeals for the Eleventh Circuit concluded "that the Third Circuit's grouping of the Sochurek factors into four broad categories provides appropriate guidance." Sanders II, 834 F.3d at 1280. The Court of Appeals clarified, however, that the factors are not exclusive and an appropriate analysis is based on the totality of the circumstances

[*40] relevant to the residency issue.  Id.  We will consider each tax year separately using the four broad Vento categories as a guide to determine whether decedent was a bona fide resident of the USVI.

### 1.    Intent

A taxpayer's intent encompasses Sochurek factors (1), (2), (7), (10), and (11).  Vento, 715 F.3d at 467.  A taxpayer's intent to remain in place for an indefinite or at least substantial period supports a finding of residency.  Id.  This intent can be evidenced by a long-term home, a long-term employment assignment, or other evidence indicating an intent to become more than a mere transient or sojourner.  Id.  However, bona fide residency is less likely to be found if there are temporary housing and employment arrangements and an intent to depart at the end of those arrangements.  Id.

#### a.    Tax Year 2002

Section 932(c)(4)(A) defines a resident of the USVI as a person "who is a bona fide resident of the Virgin Islands at the close of the taxable year".  Pursuant to section 932(c)(4)(A) we look at the intent of the taxpayer to remain in place for an indefinite or at least substantial period of time at the close of tax year 2002.

During 2002 decedent did not own a residence in the USVI.  He stayed at a condominium at the Ritz-Carlton, whereas the taxpayers in Vento purchased a

[*41] $6.75 million estate with plans to spend $20 million on renovations. See Vento, 715 F.3d at 461. At the end of 2002 decedent did not own any property in the USVI. The only personal belongings that decedent had in the USVI were kept in a storage container at the Ritz-Carlton.

At the end of taxable year 2002 decedent worked for his companies. That work did not require him to be in the USVI. He was able to do work remotely for his companies from the USVI.

Taking into consideration the factors examined under intent in Vento and the totality of the circumstances, we conclude decedent did not have the intent to remain in the USVI for an indefinite period at the end of 2002.

### b. Tax Year 2003

As we did for tax year 2002, we look at decedent's intent to remain in the USVI as of the close of tax year 2003. See sec. 932(c)(4)(A). Mr. Hogan and decedent's daughter testified credibly that to their knowledge decedent had an affinity for the USVI and wanted to retire there. Decedent also had serious health problems and wanted to decrease his role in his companies.

In July 2003 STT purchased the Nazdar. Decedent and Mr. Hogan were equal owners of the Nazdar, which was insured at a value of $300,000. On February 11, 2003, decedent signed a document titled "Lease Agreement" among

[*42] STT and himself, ITD of Destin, Inc., and the Hogan Law Firm, LLC.  This agreement was for the lease of the Nazdar and the terms of the lease were from February 11, 2003, through December 31, 2015.  Renovations were made to the Nazdar in Florida, and decedent placed personal effects on the boat before moving it to the USVI.

The cost to dock the Nazdar at the American Yacht Harbor was 74 cents per foot per day.  As the yacht was approximately 65 feet long, this fee totaled $1,443 per month.  The Nazdar had a fair market value of $300,000, whereas decedent's Destin home had a value of approximately $275,000.  Once the Nazdar was moored in the American Yacht Harbor, the Nazdar was decedent's residence when he was in the USVI.  The Nazdar had every feature that a home would have, including two kitchens, five bedrooms, and a landline phone.  It was connected to utilities including cable television.  The Nazdar remained in the USVI and would occasionally be used for day or overnight trips to visit surrounding islands.  Mr. Hogan testified credibly that decedent obtained a second USVI driver's license listing the address of the American Yacht Harbor as his address.

During 2003 decedent's daughter visited him in the USVI for her school vacations, as well for New Year's Eve.  Employees of decedent's companies, including Mr. Butcher, Mr. Keys, Mr. Barton, and Mr. Lindsey, visited decedent

[*43] multiple times in the USVI. Decedent also began planning his wedding in the USVI, which took place at a resort near the St. Thomas Yacht Club.

At the close of tax year 2003 decedent had a permanent place to stay in the USVI, and he performed work for his companies from the USVI. He also began efforts to obtain business for his companies in the USVI. His residence in the USVI had a similar value and amount of space as his Destin home. Decedent made a considerable financial investment to have a residence in the USVI, and it was not a residence that would be available just for 2003. We conclude that it was decedent's intent at the close of tax year 2003 to be a resident of the USVI and remain in the USVI for an indefinite period.

### c. Tax Year 2004

For tax year 2004 section 932 applies to a resident of the USVI who is a bona fide resident of the USVI during the entire tax year. Sec. 932(c)(4)(A). For 2004 we need to look at decedent's intent to remain in the USVI for the entire tax year.

Decedent continued to live on the Nazdar in 2004. He extended his lease with the American Yacht Harbor for the dockage of the Nazdar through December 31, 2004. He also continued to receive visits from his family and friends. His daughter spent a winter vacation, Thanksgiving, and New Year's Eve with him in

[*44] the USVI in 2004. He also copurchased a 2000 Chevy Suburban for his use on the island. The registration for the vehicle listed decedent's name as one of the owners and provided a USVI address.

During 2004 decedent continued to have SSI employees meet with him in the USVI, and they would discuss business operations pertaining to the USVI. Decedent spent significant time working on his business while he was in the USVI, as he had enabled himself to work from both Madison's office and the Nazdar. He also continued his efforts to obtain business for SSI in the USVI.

Decedent had bank accounts with USBI Financial Services, Inc., and First Bank in the USVI. His checks for First Bank listed Madison's USVI address.

Taking into consideration decedent's residence in the USVI, his ability to work for his company from the USVI, the copurchase of a vehicle, and the opening of USVI bank accounts, decedent had the intent for the entire 2004 tax year to be a bona fide resident of the USVI.

### 2. Physical Presence

A taxpayer's physical presence encompasses Sochurek factors (2), (4), (5), and (7). Vento, 715 F.3d at 467. A taxpayer's sustained physical presence in a place supports the taxpayer's being a bona fide resident. Id. at 472. Extensive absences may be inconsistent with a taxpayer's being a bona fide resident unless

**[*45]** those absences are justified by a good-faith reason such as the travel requirements of the taxpayer's profession.  Id.  A person may have multiple legal residences at the same time.  Downs v. Commissioner, 166 F.2d. 504, 508 (9th Cir. 1948) (reasoning that proof of residence in a foreign country "would not be conclusive" that a taxpayer was a nonresident of the United States because "a person may have two places of residence").

The Court of Appeals for the Eleventh Circuit acknowledged that decedent had a physical presence in the USVI and that physical presence is an especially important factor as it is mentioned in the U.S. Supreme Court's definition of "residency".  Sanders II, 834 F.3d at 1281 (citing Martinez, 461 U.S. at 330).  The Court of Appeals concluded that "[w]hat matters, though, is not the mere fact of physical presence, but its nature and extent."  Id.

For all of the tax years at issue decedent maintained a Destin residence. Decedent spent more time at this residence than his residence in the USVI.  The time decedent spent at the Destin residence was for work and for visits to his family.  We look at the nature and extent of decedent's presence in the USVI for each tax year to determine whether the USVI qualifies as a second residence in addition to decedent's Destin residence.

**[\*46]**           a.      <u>Tax Year 2002</u>

The version of section 932 that applies for tax year 2002 requires that a taxpayer be a bona fide resident of the USVI at the end of tax year 2002.  Sec. 932(c)(1)(A); <u>Vento</u>, 715 F.3d at 474.  We need to examine the period at the end of 2002.

Decedent was in the USVI for eight days in tax year 2002.  His first trip was in September for four days, and he was in the USVI for only one day in December.  In <u>Vento</u>, 715 F.3d at 474, the Court of Appeals for the Third Circuit concluded that the taxpayers had a physical presence to support their claim of residency.  Unlike decedent, Mrs. Vento spent more than half of December in the USVI; and Mr. Vento spent the entire month of December in the USVI.  <u>See</u> <u>id.</u>

We conclude that decedent's physical presence in the USVI for only eight days in 2002 and for only one day in December is not enough of a physical presence to support a claim of residency.

           b.      <u>Tax Year 2003</u>

As we did for tax year 2002, we need to look at decedent's physical presence for the purpose of deciding whether he was a bona fide resident at the close of tax year 2003.  <u>See</u> sec. 932(c)(1)(A); <u>Vento</u>, 715 F.3d at 474.

[*47] According to decedent's credit card history and bank transactions he was in the USVI for 50 days and the Destin area for 149 days in 2003. Decedent was in the USVI during seven months in 2003. He had an established residence, and he kept his personal belongings in the USVI. His presence in the USVI was more consistent than that of a sojourner. He conducted business for his companies in the USVI. Employees from his companies also traveled to the USVI. His CFO traveled to the USVI to set up his computers so that he could be fully operational from the USVI. His absences from the USVI were often business related as it was necessary for him to travel frequently throughout the continental United States to oversee his companies.

Minor son and decedent's daughter visited him in the USVI during 2003. He was married in the USVI during 2003. He had a consistent physical presence in the USVI during 2003, and his family was a part of his life in the USVI.

In December 2003 decedent was in the USVI for 11 days. He was in Destin for seven days. Decedent had a physical presence in the USVI to substantiate the claim of bona fide residency at the close of tax year 2003.

c. Tax Year 2004

We consider decedent's physical presence for the entire tax year. See sec. 932(c)(4)(A). Decedent spent 77 days in the USVI and 99 days in the Destin area

**[*48]** in 2004. During 2004 decedent was present in the USVI during the following months: January, February, March, April, May, June, July, September, October, and December.

As we discussed for tax year 2003, decedent had a permanent home in the USVI on the Nazdar, and he had a contract for 2004 to dock the vessel at the American Yacht Harbor. He maintained the Destin residence so his wife would continue to have a place to stay as she pursued her career and so that minor son would have a consistent home and place to visit throughout his childhood.

Decedent extended considerable financial resources to have a permanent place to stay in the USVI. This expenditure of resources is not consistent with his being a mere transient or sojourner. Decedent met the physical presence test for the entire 2004 tax year.

### 3. Relationships

A taxpayer's relationships encompass Sochurek factors (3) and (9). Vento, 715 F.3d at 467. We consider the taxpayer's social, family, and professional relationships. Id. A claim of bona fide residency is supported by participation in the activities of a chosen community. Sochurek v. Commissioner, 300 F.2d at 38. The presence of a taxpayer's family supports a claim of being a bona fide resident. Id. at 38-39. The Court of Appeals for the Eleventh Circuit concluded that if

[*49] decedent's relationship with Madison had no economic substance his business activities conducted while he was in the USVI might be primarily Florida contacts, not USVI contacts. Sanders II, 834 F.3d at 1282-1283. A taxpayer's not assimilating into the claimed place of residency and maintaining most of his social, family, and professional relationships elsewhere would not support a finding of bona fide residency. Vento, 715 F.3d at 465.

a. Tax Year 2002

Decedent was in the USVI for only eight days during 2002. During tax year 2002 decedent was divorced and had minor son, over whom he did not have custody, and an adult daughter, who did not reside with him. He was also in a relationship with Ms. Hennessy, his future wife, who resided in Destin. There is no definitive evidence showing that Ms. Hennessy traveled to the USVI during 2002. Thus, none of decedent's family members resided with him in the USVI, and he had no other meaningful social relationships there in 2002.

We do not need to decide whether decedent's relationship with Madison had economic substance because even if it did, we would still conclude that decedent did not have meaningful relationships in the USVI in 2002. Regardless of whether decedent had professional relationships as a result of his limited partnership with

**[*50]** Madison, on the totality of circumstances we conclude that his relationships do not weigh in favor of residency.

### b. Tax Year 2003

Decedent participated in social activities during 2003 and was considered a part of the USVI community by local businesses and associations, and we conclude that he had meaningful social connections to the USVI at the close of tax year 2003. Decedent was a member of the St. Thomas Yacht Club, and he was often seen having dinner there on Friday nights. His daughter testified that when she visited the USVI, he showed her around the community and introduced her to people that he knew on the island. He was a member of the Virgin Islands Game Fishing Club. He also attended Chamber of Commerce and Rotary Club meetings and fundraising events for the Virgin Islands National Park.

On June 18, 2003, decedent married Ms. Hennessy in the USVI. Over half of the guests who attended the wedding were USVI residents. Decedent's wife remained a resident of Destin in order to pursue her career at a veterinary clinic, but she traveled to the USVI at least four times in 2003.

Decedent pursued business opportunities for his companies in the USVI. Decedent worked with Mr. Merrill and other employees of his companies on price

[*51] quotations for potential clients including the American Yacht Harbor, the Ritz-Carlton, the Island Beachcomber Hotel, and the West Indian Dock Co.[14]

Despite the fact that decedent's family resided in the United States, we find that his social and professional contacts support a claim of residency for 2003.

### c. Tax Year 2004

During tax year 2004 decedent continued to have social relationships in the USVI. Decedent was a member of the St. Thomas Yacht Club, and he had become a part of the community at Red Hook, an area of the USVI where food and beverage establishments are located. He continued to attend Chamber of Commerce and Rotary Club meetings, and events to benefit the Virgin Islands National Park. Decedent and minor son were also individual members of the USVI Humane Society, and decedent made a charitable contribution to One Swim, Inc., a USVI charity.

Decedent's wife traveled to the USVI at least seven times in 2004. She was in the USVI in January, March, April, May, June, October, and December. Decedent also continued to pursue business opportunities for SSI in the USVI. He worked with Mr. Merrill and other SSI employees on price quotations for potential

---

[14] Without a determination of economic substance regarding decedent's relationship with Madison, some of decedent's business activities may be considered USVI contacts. See Sanders II, 834 F.3d at 1283.

**[\*52]** clients such as the Island Beachcomber Hotel, the Department of Education, RRT Produce LLC, and the University of the USVI.  SSI contracted with and oversaw the installation of surge suppression devices at the West Indian Dock Co.

Decedent's social relationships weigh in favor of his being a bona fide resident for the entire year of 2004.

### 4.    Taxpayer's Own Representations

A taxpayer's own representations encompass Sochureck factors (6) and (8). Vento, 715 F.3d at 468.  A taxpayer's identifying as a resident of a place by paying taxes and observing the other economic burdens, civic obligations, and legal formalities of residency weighs in favor of the taxpayer's being a bona fide resident.  Id.  The Court of Appeals in Vento, 715 F.3d at 477, concluded that this factor weighed in favor of a finding that the taxpayers were bona fide residents of the USVI because they attempted to pay their taxes to the VIBIR, they obtained USVI driver's licenses, and they registered to vote in the USVI.  The Court of Appeals for the Eleventh Circuit concluded in Sanders II that little weight should be given to the fact that decedent paid taxes to the USVI absent a finding that decedent's relationship with Madison had economic substance.

**[*53]**         a.      <u>Tax Year 2002</u>

Decedent filed his 2002 tax return in the USVI.  He showed his daughter his USVI driver's license.  He did not vote in the USVI.  This factor weighs slightly in favor of a claim of bona fide residency.[15]

         b.      <u>Tax Year 2003</u>

Decedent filed his 2003 tax return in the USVI.  Ms. Roberts advised him that he had properly established his residency as the USVI for tax year 2003.  His marriage license and certificate listed a USVI address for his residence.  For tax year 2003 decedent acted in a manner consistent with his claim of USVI residency.

         c.      <u>Tax Year 2004</u>

For the entire 2004 tax year decedent identified as a USVI resident.  He continued to pay USVI income tax and he listed his residence as the USVI.

       5.      <u>Conclusion</u>

After considering the four broad <u>Vento</u> categories and the totality of the circumstances, we reach the following conclusions.

---

[15]Our conclusion on decedent's own representations does not change on the basis of a determination of whether decedent's business relationship with Madison had economic substance.

**[*54]**             a.        Tax Year 2002

Decedent was in the USVI for eight days over the course of three visits. The Court of Appeals concluded in Vento that three visits a year constituted a minimal presence. See id. at 478. He did not have a permanent residence at the end of tax year 2002, and he had not spent enough time in the USVI to establish social connections. We find that decedent did not have the intent, physical presence, or relationships to show that he was a bona fide resident for 2002.

                    b.        Tax Year 2003

We conclude that decedent was a bona fide USVI resident for tax year 2003. He had the intent to be a resident at the close of tax year 2003. He was present in the USVI for 50 days and present in Destin for 149 days. At the end of the year he was present in the USVI for 11 days and in Destin for 7 days. His intent, physical presence, social relationships, and representations support decedent's claim of bona fide residency.

In Vento the Court of Appeals concluded that the daughters were not bona fide residents. Id. at 477-478. The daughters were in the USVI only for short periods, and the purpose of their trips was to vacation. Id. They did not obtain driver's licenses or have their own residence that they financially contributed to, and they did not perform business-related activities. Id. In comparison, decedent

[*55] had a USVI driver's license and a residence to which he financially contributed, and he performed work for his businesses while he was in the USVI.

### c. Tax Year 2004

We conclude that decedent was a bona fide resident for 2004. Decedent spent 77 days in the USVI and 99 days in the Destin area in 2004. For 2004 we need to look at the entire year. Decedent was in the USVI for a part of each of 10 of the 12 months. He spent more time in the USVI in 2004 than in 2003. He also spent less time in Destin in 2004 than in 2003. Taking into consideration the totality of the circumstances, we conclude that decedent was more than a transient or a sojourner for tax year 2004.

### d. Conclusion

On the basis of the foregoing, we conclude that decedent was not a bona fide resident of the USVI for tax year 2002 and was a bona fide resident for tax years 2003 and 2004. Therefore, the period of limitations for tax year 2002 has not commenced. We need to address the determinations in the notice of deficiency for tax year 2002.[16]

---

[16]In Coffey v. Commissioner, 150 T.C. __ (Jan. 29, 2018), we held that the first two pages of a Form 1040 that the VIBIR transmitted to the IRS commences the period of limitations, regardless of whether the taxpayer was a bona fide resident of the USVI. In response to the mandate of the Court of Appeals for the

(continued...)

**[\*56]** The general rule for the period of limitations is that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed". Sec. 6501(a). The term "return" for this purpose is defined as "the return required to be filed by the taxpayer". Id. The estate contends that the three-year period of limitations for each year in issue commenced on the date that decedent filed his tax return for the year with the VIBIR. The Court of Appeals in Sanders II, 834 F.3d at 1285, held that the period of limitations commenced only if decedent was a bona fide resident of the USVI. Because we concluded that decedent is a bona fide resident for tax years 2003 and 2004, the period of limitation has expired for tax years 2003 and 2004.

III.    Deduction of Consulting Fees for Tax Year 2002

Decedent was not a bona fide resident of the USVI for tax year 2002. Consequently, he was required to file a Federal income tax return with the IRS.

---

[16](...continued)
Eleventh Circuit we now conclude that decedent was not a bona fide resident for tax year 2002 and therefore the period of limitations has not expired. The Court of Appeals did not mandate that the Court address whether the two pages of decedent's 2002 return received by the IRS contained sufficient information and complied to a sufficient degree to be considered a return for the purposes of sec. 6501. Instead, the Court of Appeals held the limitations period was "triggered only if Sanders actually was a bona fide resident of the USVI." Sanders II, 834 F.3d at 1285. This Court is bound by the scope of the mandate issued by the Court of Appeals. See sec. 7482(a)(1); Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1511 (11th Cir. 1987).

[*57] See sec. 6012(a)(1)(A); Cook v. Tait, 265 U.S. at 56. He did not, and as a result respondent issued him a notice of deficiency.

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a), in certain circumstances, the burden of proof may shift from the taxpayer to the Commissioner. The estate has not claimed or shown that it meets the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue. The burden of proof remains with the estate.

The estate concedes that decedent received items of income included in the notice of deficiency but disputes respondent's disallowance of the consulting fee deductions that decedent's companies paid ostensibly to Madison. Respondent contends that the consulting fee deductions do not satisfy section 162 and that they lack economic substance. We do not need to address respondent's economic substance argument because the deductions for the consulting fees are not allowable pursuant to section 162. The estate failed to substantiate sufficiently that the consulting fee expenses were paid to Madison and offered no credible evidence that the expenses were reasonable.

[*58] Deductions are a matter of legislative grace, and a taxpayer must prove its entitlement to any deduction. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). To that end a taxpayer is required to substantiate the item underlying each claimed deduction by maintaining records sufficient to establish the amount of the item and to enable the Commissioner to determine the correct tax liability. Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); sec. 1.6001-1(a), Income Tax Regs.

Section 162 permits a taxpayer to deduct ordinary and necessary business expenses paid or incurred during the taxable year, including "a reasonable allowance for salaries or other compensation for personal services actually rendered". Sec. 162(a)(1). Only the portion of an expense that is reasonable qualifies for deduction under section 162(a). United States v. Haskel Eng'g & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967); Fuhrman v. Commissioner, T.C. Memo. 2011-236, slip op. at 6. The reasonableness concept has particular significance in determining whether payments between related parties represent ordinary and necessary expenses. See Fuhrman v. Commissioner, slip op. at 7; see also Bittker & Lokken, Federal Taxation of Income, Estates, and Gifts, para. 20.1.5, at 20-18 (3d ed. 1999).

**[*59]** For 2002 decedent's companies claimed deductions for consulting fees paid to Madison. ITD of Destin, Inc., Surge Suppression, Inc., and Surge Technology, Inc., claimed deductions of $375,000, $658,000, and $167,000, respectively, for 2002, allegedly for payments for consulting services provided by Madison. Only ITD of Destin, Inc., had a contract with Madison. The estate did not produce evidence that decedent's companies paid amounts equal to the amounts deducted.

Decedent did not join Madison until September 2002 and was present in the USVI only eight days that year. He was not able to meaningfully interact with Madison partners during this time, nor was he able to make any sales or move portions of his companies' business functions to the USVI during those eight days. There is no evidence that decedent performed any actual services on behalf of Madison during 2002. There is also no evidence that in 2002 decedent performed anything other than the same services that he had performed previously for his companies.

Decedent's companies claimed deductions for consulting fees paid to Madison totaling $300,000 for 2003. SSI claimed $5,000 for 2004. These fees were for the entire year. It seems highly implausible that the fees for 2002 were approximately four times higher than the fees for 2003 and 2004, given that the 2002 fees covered only a four-month period. The estate provided neither

[*60] documentary evidence nor testimony regarding how the consulting fees were determined. The record is devoid of any invoices from Madison to decedent's companies.

There is no evidence showing the number of decedent's consulting hours for 2002, no evidence showing what specific tasks were performed, and no evidence that the consulting fees allegedly paid were reasonable in amount, except for a report by a Madison-hired consultant. This report was self-serving and prepared after the alleged services were performed. Consequently, respondent's determinations in the notice of deficiency for tax year 2002 are sustained.

IV. Additions to Tax for Tax Year 2002

A. Section 6651(a)(1)

Section 6651(a)(1) imposes an addition to tax if an individual taxpayer fails to file his Form 1040 by the required due date. Under section 7491(c), the Commissioner bears the burden of producing evidence with respect to the liability of the taxpayer for any addition to tax. See Higbee v. Commissioner, 116 T.C. at 446-447. Decedent did not file a Form 1040 with the IRS for tax year 2002. Therefore, respondent has met his burden of production.

**[\*61]** B.    Section 6651(a)(2)

Section 6651(a)(2) imposes an addition to tax if a taxpayer fails to pay his Form 1040 tax by the required due date.  The section 6651(a)(2) addition to tax applies only when an amount of tax is shown on a return filed by the taxpayer or prepared by the Secretary.  Sec. 6651(a)(2), (g)(2); Cabirac v. Commissioner, 120 T.C. 163, 170 (2003), aff'd without published opinion, 94 A.F.T.R. 2d (RIA) 2004-5490 (3d Cir. 2004).

Since decedent did not file a Federal income tax return with the IRS for tax year 2002, the section 6651(a)(2) addition to tax may not be imposed unless the Secretary has prepared a substitute for return that satisfies the requirements of section 6020(b).  See Wheeler v. Commissioner, 127 T.C. 200, 210 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008).  Respondent has established that the Secretary prepared a substitute for return for 2002 that satisfies the requirements of section 6020(b) and that decedent owes a deficiency for his Federal income tax obligation for 2002.  Respondent has met the burden of production.

C.    Reasonable Cause

The additions to tax under section 6651(a)(1) and (2) apply once the Commissioner has met the burden of production unless the failure to comply was due to reasonable cause and not due to willful neglect.  The taxpayer bears the

**[\*62]** burden of establishing reasonable cause. <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447. Reasonable cause is established if the taxpayer exercised ordinary business care and prudence but was nevertheless unable to timely file or timely pay the tax due on his return. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect means a conscious, intentional failure or reckless indifference toward filing or payment obligations. <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).

The estate contends that decedent did not file an income tax return with the IRS because he was a bona fide resident of the USVI and had filed a return with the USVI. Decedent consulted with an accountant and an attorney before he filed his 2002 income tax return. He was advised to file as a bona fide resident. We conclude that there was not willful neglect and decedent acted with reasonable cause. Therefore, we do not sustain the additions to tax under section 6651(a)(1) and (2).

D. <u>Section 6654</u>

Section 6654 imposes an addition to tax on an individual taxpayer who underpays his or her estimated tax. A taxpayer has an obligation to pay estimated tax for a particular year if he or she has a "required annual payment" for that year. Sec. 6654(d). The required annual payment is equal to the lesser of (1) 90% of the

**[\*63]** tax shown on the individual's return for that year (or, if no return is filed, 90% of his or her tax for such year) or (2) if the individual filed a return for the immediately preceding taxable year, 100% of the tax shown on that return. Sec. 6654(d)(1)(B); Wheeler v. Commissioner, 127 T.C. at 210-211.

Respondent showed that decedent filed a tax return for 2001 and that the amount of income tax shown on the return was $83,513. Decedent paid income tax for tax year 2002 of $45,000. Because decedent failed to pay estimated tax equal to 90% of the tax owed for 2002, there was an underpayment. See sec. 6654(d)(1)(B)(i). He also failed to pay 100% of his 2001 income tax liability in 2002. See sec. 6654(d)(1)(B)(ii). Respondent satisfied the burden of production for the section 6554 addition to tax with respect to tax year 2002.

No general exception for reasonable cause applies to the addition to tax under section 6654. See Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Decedent did not qualify for any exceptions pursuant to section 6654(e). We sustain the addition to tax under section 6654 for tax year 2002.

We have considered all of the arguments made by the parties, and to the extent we did not mention them above, we conclude that they are moot, irrelevant, or without merit.

**[\*64]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.